Good morning, Your Honors. My name is Max Jordan. I represent Sandra Pace, a white woman who sued the Livingston Parish School Board for racial discrimination. After two days, a jury rendered a verdict in favor of my client, and the trial court took away that jury verdict with a Rule 50. I think that the key issue in this case was, was the evidence that was presented to the jury verdict as a matter of law. And of course, a Rule 50 involves, and in this case as well, not just a factual determination but also a legal determination as to what standards should be applied in looking anew at that case under a Rule 50. And I believe that the law is that you get, as a panel, get to look at it with new eyes de novo and determine using those same kinds of guidelines as to whether or not the facts were legally insufficient to warrant a reasonable jury finding in favor of Sandra Pace. We think that a Rule 50 should not be employed by a trial court to overturn a jury verdict unless there's just no evidence to support the verdict. And here in this case, Ms. Pace made a problem-facing case that she was a protected class, that she was, she applied for the position, that the position was given to someone outside of that class, and that she was qualified for that position. And it seems to me that the battleground in this case came to be a fight over whether or not Ms. Pace was qualified for the position. Qualifications were simple. A driver's license, a high school diploma, and five years' warehouse experience. Now Sandra Pace, for 16 years, had been the purchasing agent for the Livingston Parish School Board. She handled inventory. She did the shipping, the receiving, the ordering. She went out there behind the school board office and actually helped drive trucks and load materials. She was the one responsible for making sure that everything in that warehouse got to the school where it needed to go to. Now what she did as the business manager for 16 years was warehouse management. Well, she might not have won a forklift contest, and she might not have been the strongest person to lift and tote out there, but she knew all of the aspects of the business management of the warehouse. And we presented all of it. The other departments besides the, where there was a transportation, there was maintenance, there were multiple departments. Transportation and maintenance was a separate department. But she did the purchasing for them too. She was the business manager over the whole. She was, she wasn't the business manager. Well, the purchasing agent. She was the purchasing agent. The relevance of that is, didn't she testify that she didn't feel that she was as much of a supervisor, manager of those departments? Correct. But then how would that be consistent if she had the same overarching responsibility over the warehouse? Well, because of the duties that were involved. There were duties that she did do in relating to the warehouse. She was the de facto warehouse manager for three years. And for the 16 years she was there, they didn't have a warehouse manager. So they created that position, and it was something that she had just been doing for all of that period of time. In fact, she's the one that went through three different systems of installing inventory control, shipping and receiving management. She had the only computer in the entire school board office that controlled those things. And that evidence was, those qualifications were before the promoting committee? You understand? And she may have testified to that full array that looks much more warehouse manager-y, but is it supported in the record that that full set of qualifications was known to the committee that made the decision that you dispute? Well, the committee, Mr. Benkaz, who testified by way of deposition because he had passed, Mr. Watson, who at the time was the personnel director and who is now the superintendent, and Ronnie Volgamore, who Ms. Pace trained in the warehouse, were the three members of the committee. So I can't imagine that that could have possibly escaped their attention, especially given the fact that Mr. Benkaz said that not only was she qualified, she was eminently qualified. She was the best person for the job. And so in this case, we presented our prima facie case, and it shifts the burden under the modified McDonnell-Douglas rule to the defendant to show what is the race-neutral reason she didn't get the job? And their race-neutral reason was, well, we don't believe she was qualified. You think that's, in the record, in the district court ruling, it couldn't differently be that she wasn't qualified? That wasn't really their position. Their position was that she wasn't qualified. And Ms. Hughes went to a great amount of trouble in making the presentation to the school board where the five candidates, she was, Ms. Pace was the only one marked no, not qualified. And then on top of all of that, we find out after the fact that they're making telephone calls the day of the vote to the school board members saying, hey, we need this black man to get this job because a lot of black votes in Denham Springs in the school board election are going to depend upon this. Now, playing racial politics with an employment decision is what this, what the law is designed to protect against. What was the jury asked for questions? Was the jury question directed to whether or not she was qualified? Yes. The jury verdict form, if you look at the record accepts, I think it's number three in the record accepts, the jury verdict form had all three of the basic questions, including was she qualified? And they answered that question, yes. And then they asked, was race a motivating factor in the hiring decision? And the jury answered yes. And the last question was, do you think that she was discriminated against? And the jury answered yes. And I think the trial court in the rule 50 went back and said, well, I didn't like this testimony. I really didn't. This was kind of goofy. And in order to- Well, be precise. The district court didn't say this is kind of goofy. The district court said, I'm looking at one qualification, five years where I experienced. No one denies Kolar had that. The issue is, did she have the two years that we know she wasn't the manager? That's what the district court said. Didn't say there's goofy evidence. He just took a narrow view of what warehouse manager is. And that may well be. And what I argued to the jury was, she wasn't applying for a position of warehouse man. She was applying for the position of warehouse manager. And all of the resumes of the people from the outside the system had all similar shipping, receiving, inventory control, all of those kinds of things. And yet, Ms. Hughes, when she created that document, she also said they were qualified, but only Ms. Hughes. And so we think that there was really another reason, you know, if they would have said, we're not hiring her because she's too qualified, that might have gotten some traction. We're not hiring her because she's too valuable in the purchasing department to let her leave and go to the warehouse. That might have gotten some traction. But I think that when the jury heard all the evidence, and their supposed race neutral reason was she's not qualified, I don't think they bought that at all. I think that then they listened to the testimony of school board members saying we were getting telephone calls that day and it was all about racial politics. And the telephone, when you say calls, it was calls by one person, correct? By the superintendent who made the- Pope? Or Mr. Pope? Randy Pope. Randy Pope. Okay, and so is the argument therefore a cat's paw theory? What evidence- Yes, sir. It is. Okay, so what's the evidence in the record that Pope had control over these members? Had control, well, he's a superintendent. He makes, it's within his purview and his authority to make the recommendations to the school board and- They work at his discretion or he works at their discretion? Well, he's appointed by them, but he ultimately, under Louisiana law, he's the one who makes the recommendations to the school board on all hiring and firing decisions. Okay, and so what's your best legal authority that that would fit into a cat's paw theory? I don't know how to answer that question. Okay, that's all right. I guess, the separate question was, was there a jury question that came out from the jury? Do you remember? About- About, I thought I saw in the record- About whether he was imputed? Whether the school board was imputed by the actions of the- Was that the jury's question? They didn't get that question. They didn't get that question. No, but did the jury- It's not in the law. Did the jury ask a question? That's, and I don't know. I thought I saw a reference to it. There's no, okay. No, sir. What if the, one of the management deciders said that he voted for Kolar after this conversation? Yes. What if he was doing that to further his own political benefits rather than to vote for the black man versus the white woman? If he was trying to appear more attractive politically for his own good, does that matter? I don't think that that matters. I think the question is whether or not race was a motivating factor. And if race was a motivating factor in the employment decision, whether it's, you got nine members of a school board, you got one superintendent, they've all got their own little agendas. And so- Was the vote unanimous? The vote was unanimous to go along with Randy Pope's hiring recommendation. And Tate is the individual that said he had concerns about the political outcome, correct? He did, but he- He must have voted- He voted that way as well. So, we think that under the McDonald, modified McDouglas rule, that the jury had the right to infer racial discrimination based upon two things. The some evidence that they heard from Tate and Procop about the telephone calls and also about the fact that they didn't buy the race neutral determination that she was unqualified. And so- And your best evidence that that would be false, a false pretext is that the chart showed all the other individuals had similar non-warehouse manager positions and yet- Wouldn't say that's the best evidence, but I would say that that's certainly some evidence that this was a pretext rather than the truth. And that the truth was that somebody behind the scenes was playing some racial politics with an employment decision in order to get enough votes to get their guy elected to the school board. And those school board elections, when you got a 5-4-4-5 split all the time, all the time, that one important vote can mean a lot. Any other questions? Thank you. You saved some time for rebuttal. Mr. Jones? Good morning, I'm Kerry Jones. I'm counsel for the Livingston School Board. You're going to have to speak up or there's going to be no record of your- I apologize, your honor. Being here today. I think there were some liberalities taken with the record. And I'm not sure the court's going to find anything about a split, anything about background whispering to the board members and those kinds of things. No such things. But the calls were made. The calls were made. That's in the record. Stepping back and looking at how Ron Collar became the recommended candidate. The business manager, Terry Hughes, decided that a manager in the warehouse was needed. She recommended that to the superintendent. The superintendent instructed her to go forward and develop that position. She did. She developed qualifications. She developed a job description. And she had those things approved by the board. And they authorized her to advertise, move forward. What was the makeup of the jury, racial makeup of the jury? It was varied. I think it was a seven-member jury. I think that five of the members- Six-person jury, seven or eight? I think it was a seven-person jury. I think five were white, one was African-American, and then one, I don't remember his nationality. Asian, maybe. It was Asian. I can't remember if it was Japanese or Chinese. Were they all women? They were not all women. The Asian gentleman was a male. But the rest were women? And the rest were women. So your client's non-discriminatory reason for the decision was what? She didn't have those five years, or Kolar was better qualified? Well, there were two things that happened. Among the interview committee, which was step one, received the resumes, set up interviews, and interviewed the candidates. There were three members of that committee, John Watson, Rod Volgmore, and Brent Benkatz. Once the interviews were conducted, the three sat down on a two-to-one vote. They preferred Ron Kolar and testified it was because of his experience. He had been in the warehouse 12 years, and because of his satisfactory performance. If you look at John Watson's testimony, my sense was qualification as far as whether or not any of the seven candidates met the qualifications didn't enter into the discussion at that point. What happened was that the recommendation of the committee was reported to the business manager, Mitch Hughes. She went through the resumes. She sat down and talked to Brent Benkatz, who was on the committee, and she went through all of that material. And her conclusion was that Ms. Pace was not qualified for the position because she didn't have five years warehouse experience. She relayed that on to the board with her recommendation. So was not qualified as opposed to was not as qualified as Mr. Kolar? I think at the stage of the interview committee, I think the conclusion was she was not as qualified. Not as? Well, that's different than what you just said. You said not qualified. Where Ms. Hughes reviewed the resumes and discussed it with Mr. Benkatz. She concluded that Ms. Pace was not qualified. She didn't meet the five-year warehouse experience requirement. And if you look at Ms. Pace's resume, there's a packet of resumes in the record. And Ms. Pace's resume claims served as warehouse manager during first three years as purchasing agent. On her resume, there's nothing else about warehouse experience or anything of the kind. I asked her on the stand, I said, Ms. Pace, did you claim only three years experience on your resume? Yes. Has your board moved for a directed verdict at the close of the plaintiff's case? At the close of the plaintiff's case and in the conclusion of the evidence. Sorry, they did. You said they did? At the conclusion of the evidence. At the conclusion of the plaintiff's case, Rule 50 motion was made. There was a gender discrimination claim and the judge dismissed that and dismissed the gender discrimination claim and then said, go forward, defend it with your evidence. At the close of the defendant's evidence, there was no rebuttal. Renewed the Rule 50 motion at that point. The judge said that he was going to take it under advisement, let the jury make a decision and he would consider it later if need be. So, yeah, it's in the record. It's argued and it's pretty detailed. But as far as Ms. Pace's qualifications, she claimed three years on her resume and when questioned, admitted that she only claimed three years. And I said, not four, not five, not ten. You wrote down three years on your resume as your warehouse experience. She said, yes. I said, do you know of any reason that the school board representatives should not have taken you at your word, and she said, no. Now, at trial she talked about related experience, things that ought to have been counted, but here's the problem with that. The law has been in this circuit for a long time, that if an employer is going to publish qualifications, they must be objective qualifications. Five years warehouse experience, for example, is objective. Did the judge grant a new trial or just directed the verdict? He didn't grant a new trial. He did not. What he ruled was that judgment as a matter of law should be granted. The suit dismissed, and he said that the motion for new trial was moved as a result of that. So then the question for us is whether there was some evidence in which a reasonable juror could have so concluded. I have a little trouble saying that when you got people in charge making phone calls to the board and putting a racial motive in it, it's very difficult to disregard that and to get into something as soft as qualification. I mean, you're talking to me of the extraordinary demonstration of inadequacy in order to, given that record, to take this away from a jury. We have, the few times this court has taken these away from juries, the Supreme Court's reversed it. Well, and I think the state, the claimant's own statement that she lacked years of qualification and experience is strong enough to take it from the jury. Now- But wasn't, I mean, the board that made the decision indicated that she's a finalist with one other Kolar, correct? So that would suggest that they thought she was qualified when you look at the full list. I don't think there was any such indication. There was one recommendation, Ron Kolar, who went on the board agenda. There were not alternatives. Okay, I've just got noted down, Ben Cass testified top two candidates considered were Pace and Kolar. Tate testimony also indicated deciding between Pace and Kolar. Among the interview committee, the three member interview committee, Watson, Volk, Moore, and Cass. Yeah, it was a two to one split. Ben Cass preferred Pace. And he testified that he did, in his opinion, consider her qualified. Okay, and then the defense exhibit indicates consideration of, for example, Gorey, and they were counting as qualification the Toys R Us time, which wouldn't be weird. I don't know. What do you mean you don't know? I was not present at the interviews. No, defense exhibit number nine, Gorey, Toys R Us. In other words, it looks like a pretty broad interpretation of warehouse experience. On his resume, that's correct. But you were just saying she put, her resume is controlling us. There's no evidence in the record as to what Gorey's qualifications were, as reported in the interview, and, and. Oh, he might have elaborated more. He might have elaborated in the interview. I don't know. So one member of the committee thought she was qualified. That's correct. She testified at trial? She, did Miss Pace? Yeah. Yes, she testified at trial. So the jury was told by one people that she was qualified, and so you got that evidence, and you got the evidence of the phone calls. The, the phone call evidence, I consider, the term used to be a frolic of his own. I think the superintendent was out there making phone calls on his own. The interview committee, everybody. He was calling as supervisor, wasn't he? He wasn't calling as a good old boy. Pardon? He was calling in his capacity as supervisor. He's calling these. He's calling in his capacity as superintendent. So how's that a frolic? Of his own. Because there's no evidence that the board paid any attention to him when he made those calls, or that it influenced the choice of, of the candidate that was made. The, the, the parties argued to the jury vigorously this point of what's the warehouse manager, is it narrow or broad, that, right, that was argued to them. Yeah, I think even ambiguity and some other kind of thing. Yeah, fully argued and ultimately they made the specific finding that she was qualified. They did, based upon the evidence at trial, but you have to look at the process at the time the employment decision was made, you know, by the time you get to the jury, sometimes evidence is a little bit different from when the employer made its employment decision. Now, you heard his argument that the decision makers were intimately and over many years familiar with Ms. Pace's exact duties. I heard the argument. There's no evidence to that effect. Are you, what, what? Didn't they testify? That they had worked with her or seen what it was? John Watson, who was the assistant superintendent, testified that he had not been at the central office for a number of years and really didn't know that much about what she did. Ronnie Volgamore, one of the three members of the committee, did not testify. Brent Benkast said that in his opinion, he thought that experience should count. So, but as far as the school board members, there was no testimony at all concerning her qualifications, what they knew about what she did, or any of those kinds of things. So, that's where the evidence goes. And I understand, Judge, I got to agree with you. If I had heard about those phone calls, you know, it's bothersome. But it has to influence the outcome based on race. They were racially tinged phone calls, but did the decider base its decision? But, excepting that, one of the hurdles that you have to get over is that the people who made the decision itself were conflicted over the issue. And so that now you're going to come back and say, as a matter of law, the jury could not have found, despite that, direct testimony by a person who was making the decision on the ground, that this person was qualified. I just, I find that, I don't know how we do that. I mean, I just, I don't know. Well, it was the business manager who reviewed. I was going to try to explain why, but I'm not sure what the answer is. It was the business manager who reviewed the resumes and the interview information that decided she was not qualified. And according to the resume, she was not, according to her testimony, she had no reason to believe that the school board thought otherwise. And it's hard to find qualifications when the plaintiff says she didn't have them. I don't think any jury can base its decision or determine that the plaintiff is qualified when the plaintiff says she didn't convey that she was qualified, she didn't put on the resume that she was qualified, and the school board had no reason to believe otherwise as far as she knew. That, to me, is determinative on qualifications, and I don't think you can infer from evidence presented at trial that back then the decision should have been different by the school board. One of the people back then thought she was qualified. One of the interview committee. Who put together Defense Exhibit 9? The warehouse manager listing each one, listing under just— Terry Hughes, the business manager. So Ms. Hughes, the one who said, okay, so she's listing these various Toys R Us is a warehouse manager qualification, and yet she's the one saying Pace wasn't? Well, the way she compiled that list was to look at the resumes and discuss with Brent in the interviews what the candidates had to say, and that's how she compiled that. And to that point, I mean, there's no evidence—to the point that Ron Kolar got on the agenda as the recommended candidate, there's no evidence that the process was tainted by race in any way, shape, or form. So, what you have is the superintendent making phone calls, foolishly, but the superintendent making phone calls, but no evidence that those phone calls made a difference, no evidence that there was discrimination involved in the ultimate decision to hire Ron Kolar by the school board. All right, thank you, sir. Thank you, sir. All right, Mr. Jordan, opposing counsel just said that the plaintiff said she didn't have the qualification. She said she didn't have three years warehouse manager experience. That was not the qualification. Did she explain? Yes, she explained that she had other experience that included all these other things that were related to the warehouse, just like all these other candidates explained that they were in shipping and receiving, that they were in inventory control. All of those kinds of things were apparently decided that that made—that gave them the essential warehouse experience, according to Ms. Hughes' little chart, but somehow there was a different standard that was applied to Ms. Pace when you start adding up all the keeping track of, the making sure that it got to the schools, the testing of the materials that had to go into the warehouse, et cetera, and you know, I questioned Ms. Hughes. I said, did the school board, either you who were in charge of this process or the superintendent, was warehouse experience ever defined? And she said, no, we didn't define warehouse experience in terms of the qualifications, so we went to some other Fifth Circuit case law that said, well, if you're talking about experience, then you look at the basic qualifications. So I asked Ms. Hughes, what were the basic qualifications? Didn't you put together a job description? She says, yes, it had 13 different things that I wanted this person to be able to do. Did Ms. Pace possess all of these? Yes, she possessed all 13 of those job qualifications. So I would suggest that even though Terry Hughes may have filled out the little chart and marked the X that said that Sandra Pace was not qualified, by her own admission, she put together the job description and the basic qualifications, and she said Sandra Pace could do all of them. So given the fact that there's no definition of the term warehouse experience, we have to rely upon our common sense, and all of these activities constitute one form or another of warehouse experience. And Ms. Hughes was the only person who apparently said she was unqualified, but then kind of recanted that when she said that Ms. Pace possessed all 13 of the job qualifications. So we believe that as a matter of law, it just doesn't make sense to say that she was unqualified for the position. There's ample evidence in the record. There's more evidence that she was overqualified than that she was not qualified. And we think that the jury legitimately did not accept that race-neutral justification, and that alone, without Prokoff's and Tate's testimony that there were phone calls being made that involved racial politics, that that alone would have given them... Superintendent didn't question her qualifications, apparently. There was something going on, and he never testified, which was, you know, Randy Pote never took the stand in this case. And frankly, I don't know what the jury thought of that. Did you try the case? Sorry? Did you try the case? I did try the case. I was tempted to call him myself, but, you know, lawyers aren't supposed to play that kind of game at the trial level. And I told the jury, I said, I had so many questions I wanted to ask that man, but I didn't want to call him as my witness. All right, thank you. We have your argument.